Thomas J. **BOWERSFIELD,**
Jr., Plaintiff,

v.

**SUZUKI MOTOR CORPORATION**
**and American Suzuki Motor**
**Corporation, Defendants,**

v.

**Christian French, Third**
**Party Defendant.**

**Civil Action No. 98–1040.**

United States District Court,
E.D. Pennsylvania.

Aug. 28, 2000.

Edward J. McGinn, Jr., Eric A. Weiss, Philadelphia, PA, for Plaintiff.

Andrew J. Stern, Beasley, Casey and Erbstein, Philadelphia, PA, Kim Plouffe, German, Gallagher & Murtagh, Philadelphia, PA, for Defendants.

## ORDER & MEMORANDUM

DuBOIS, District Judge.

### ORDER

**AND NOW**, to wit, this 28th day of August, 2000, upon consideration of the Joint Motion of Defendants Suzuki Motor Corporation and American Suzuki Motor Corporation for Summary Judgment (Doc. 40, filed Aug. 27, 1999), Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Doc. 41, filed Sept. 21, 1999), Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Doc. 43, filed Oct. 7, 1999), and related submissions; **IT IS ORDERED** that the Joint Motion of Defendants Suzuki Motor Corporation and American Suzuki Motor Corporation for Summary Judgment is **DENIED.**

### MEMORANDUM

## I. FACTS

This case arises out of an automobile accident which occurred in the early morning hours of March 10, 1996 at the intersection of 7th and Spruce Streets in Philadelphia, Pennsylvania. At that time plaintiff, Thomas J. Bowersfield, Jr. and two companions were traveling west on Spruce Street in a 1992 Suzuki Samurai (the "Samurai"). Another vehicle, traveling north on 7th Street, collided with the Samurai and sped away.

Christian French, who owned the Samurai and is a third-party defendant in this action, was driving the Samurai. Brian Farnham was seated in the right front bucket seat of the vehicle. Neither French nor Farnham was wearing a seat belt. Plaintiff was riding unrestrained on the uncarpeted floor in the cargo area at the rear of the Samurai.

The point of impact on the Samurai was the left rear quarter panel. As a result of the impact, the Samurai careened out of control, first spinning counterclockwise and striking a traffic signal pole and then spinning clockwise, striking another pole before coming to rest facing in a northeasterly direction on Spruce Street.

Plaintiff was ejected from the vehicle as a result of the collision. He sustained severe permanent injuries, including brain injury, facial fractures, blindness to the right eye and facial paralysis.

The Samurai was designed and manufactured by defendant Suzuki Motor Corporation ("SMC"), a Japanese auto manufacturer; in the United States it was distributed by defendant American Suzuki Motor Corporation ("ASMC"), a California corporation. Since its introduction in 1985 and through 1991, the Samurai was designed, manufactured and distributed in the United States primarily as a four passenger "car." Four seats, with lap belts for the rear occupants, were provided with the vehicle as standard equipment. For a number of years beginning in 1985 defendant SMC's advertisements regularly depicted people riding in the rear compartment, behind the driver and the front passengers. No evidence was presented as to the duration of this advertising campaign.

By 1992 defendant SMC faced constraints in the number of cars that it could import to the U.S. by virtue of an import quota mandated under the Japanese Voluntary Export Restraint; there was no such restriction with respect to trucks. Also, new federal regulations were passed in 1992 requiring lap and shoulder belt restraints in the rear passenger compartment of all sport/utility vehicles ("SUVs") sold in the U.S. *See* 49 C.F.R. § 571.208 (1992).

In response to these pressures, defendant SMC redesigned the Samurai for the U.S. market, converting it from a permanent four-seater into a vehicle with the option of being configured as a four-seater, or a two-seater with a rear cargo area. The redesigned Samurai was sold with mounting holes in the rear cargo area so that consumer's who wanted four-seats could purchase a parts kit separately and have the rear seats installed.

When configured as a two-seater with a rear cargo area, the redesigned Samurai resembled a small pick-up truck. Unlike a pick-up truck, however, the Samurai did not have a physical barrier to separate the front seats from the rear cargo area. Defendants never marketed the Samurai as a pick-up truck.

Beginning with the 1992 model year, defendant SMC added a warning label in the rear cargo area of the Samurai. The warning was located on the left rear wheel well, approximately 1–1/4 inches above the cargo bed, and was approximately 2.4 × 2.8 inches in size. It read as follows:

WARNING!

This vehicle is designed to carry
a maximum of two persons
(The driver and one front seat passenger)
—Do not ride as a passenger in
the rear of this vehicle or you
could suffer severe injury or
death in the event of an accident,
abrupt maneuver, etc.
—Do not modify this vehicle to
accommodate additional passengers.

On the morning of March 9, 1996, plaintiff had been a licensed driver for seven years. He testified that he was in the habit of buckling his seat belt for general safety when riding in motor vehicles and he admitted noticing that the rear cargo area lacked rear seats and contained no passenger restraint system. Nevertheless, plaintiff voluntarily chose to ride in the rear cargo area of the Samurai.

Plaintiff testified that he did not specifically recall whether or not he had seen the Samurai's warning label. However, he also stated that if he had noticed such a warning, or if there had been a physical divider between the front seats and the rear cargo area, he would have "made other plans—decided not to sit there and made other plans, taken another vehicle."

## II. PROCEDURAL HISTORY

Plaintiff originally filed this action in state court. On February 27, 1998 defendants SMC and ASMC removed to this Court, based on diversity of citizenship under 28 U.S.C.A. § 1332 (West 2000). On June 8, 1998 Plaintiff filed an Amended Complaint (Doc. 13), and on July 1, 1998 he filed a Second Amended Complaint (the "Second Amended Complaint") (Doc. 15). The Second Amended Complaint contains two counts. In Count One plaintiff asserts a claim in strict product liability under Restatement (Second) of Torts: § 402A (1965)[1]. In Count Two plaintiff asserts a claim of breach of the implied warranty of fitness for a particular purpose.

On July 15, 1998 Christian French was joined as a third party defendant in this action by defendant ASMC (Doc. 19). On that date defendants SMC and ASMC filed separate answers to plaintiff's Second Amended Complaint with affirmative defenses; defendant SMC's answer included a cross-claim against Christian French (Docs. 17 and 18).

Plaintiff moved to dismiss defendant SMC's third party complaint on July 31, 1998 (Doc. 21). On December 28, 1998, following oral argument, that motion was granted with respect to defendants' claims that Christian French was solely liable to plaintiff, and defendants' claims for indemnification and equitable subrogation, but was denied in all other respects (Doc. 33). By stipulation between plaintiff and defendants SMC and ASMC, Count Two of the Second Amended Complaint for breach of implied warranty was dismissed with prejudice on July 22, 1998 (Doc. 20).

After completing discovery, defendants SMC and ASMC filed a joint motion for summary judgment on August 27, 1999 (Doc. 40). Plaintiff filed his opposition to

1. As discussed later in this Memorandum, plaintiff pursues this claim under two separate theories: (1) failure to warn; and (2) the crashworthiness doctrine.

defendants' joint motion on September 21, 1999 (Doc. 41). Defendants filed a reply on October 7, 1999 (Doc. 43). It is defendants' joint motion for summary judgment that is presently before the Court.

### III. STANDARD OF REVIEW

"If the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[,]" summary judgment shall be granted. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the evidence must be considered in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Therefore, "[i]f the evidence [offered by the non-moving party] is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On the other hand, if reasonable minds can differ as to the import of the evidence presented that speaks to an issue of material fact, summary judgment should not be granted.

### IV. PENNSYLVANIA STRICT PRODUCT LIABILITY LAW

This is a strict product liability case arising out of an automobile accident occurring in Pennsylvania. Pennsylvania law is applicable to the case.

The Supreme Court of Pennsylvania has adopted § 402A of the Restatement (Second) of Torts in strict product liability cases. *See Webb v. Zern*, 422 Pa. 424, 427,

220 A.2d 853, 854 (1966). According to § 402A:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if:
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without a substantial change in the condition in which it is sold.
>
> (2) The rule stated in subsection (1) applies although:
>
> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>
> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts (1965).

■ In *Azzarello v. Black Brothers Co., Inc.* 480 Pa. 547, 391 A.2d 1020 (1978), the Supreme Court of Pennsylvania held that whether or not a product is "unreasonably dangerous," as used in the Restatement formulation, involves a threshold question of law to be determined by the court. *See Azzarello*, 391 A.2d at 1024–26. This is a social policy inquiry involving a risk/utility analysis to determine whether the risk of loss should be placed on the supplier of the defective product without regard to fault or privity of contract. *See id.*

■ The defendant bears the burden of establishing that its product is not unreasonably dangerous in an *Azzarello* risk/utility analysis. *See Shetterly v. Crown Controls Corp.*, 719 F.Supp. 385, 387–88 (W.D.Pa.1989). If the Court concludes that the defendant has met its burden, summary judgment for the defendant is appropriate. *See Shetterly*, 719 F.Supp. at 388. In the context of a summary

judgment motion, if the Court determines that the defendant has failed to establish that its product is not unreasonably dangerous, the Court must analyze the evidence presented to determine whether there are any genuine issues of material fact as to § 402A liability or any affirmative defenses. If the Court answers both of those questions in the affirmative, the case is submitted to the jury. *See Azzarello*, 391 A.2d at 1027 (quoting *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 100, 337 A.2d 893, 902 (1975)).

In the typical action under § 402A, a plaintiff must prove that "(1) the product was defective, (2) the defect existed while the product was in the control of the manufacturer, and (3) the defect was the proximate cause of the injuries." *Habecker v. Clark Equip. Co.*, 36 F.3d 278, 284 (3d Cir.1994) ("*Habecker III* ") (citing *Walton v. Avco Corp.*, 530 Pa. 568, 575–76, 610 A.2d 454, 458–59 (1992)). In cases involving motor vehicles, Pennsylvania also "imposes liability on the manufacturer not for causing the accident, but rather for failing to minimize the injuries or even increasing the severity of injuries in an accident brought about by a cause other than the alleged defect." *Habecker III*, 36 F.3d at 283. This second variant of strict product liability is known as the "crashworthiness doctrine." *Id.* In order to establish a claim under this doctrine, a plaintiff must show: (1) that the design of the vehicle was defective; (2) that at the time the vehicle was designed an alternative, safer design, practicable under the circumstances, existed; (3) what injuries, if any, the plaintiff would have received had the alternative, safer design been used; and (4) what injuries were attributable to the defective design. *See id.* at 284.

## V. DISCUSSION

Plaintiff advances two separate theories in support of his strict product liability claim. First, plaintiff argues that the 1992 Samurai in which he was traveling on the morning of March 10, 1996 lacked suffi-

cient warnings to apprize him of the dangers of riding in the rear cargo area, and was thereby defective in design. Second, plaintiff relies on the crashworthiness doctrine to argue that defendants are strictly liable because they failed to adequately design the Samurai to protect passengers riding in the rear cargo area during a collision.

Defendants contend that they are entitled to summary judgment on several grounds. First, defendants assert that they are entitled to summary judgment under *Azzarello* because the Samurai was not unreasonably dangerous as a matter of law. Second, with respect to the warning defect claim, defendants argue that plaintiff can not recover because there is no duty to warn of the open and obvious risks associated with riding in the rear cargo area of the Samurai. Third, in connection with plaintiff's application of the crashworthiness doctrine, defendants argue that plaintiff can not establish a product defect because the Samurai was safe for its intended use as a two-seat sport/utility vehicle. Finally, defendants contend that plaintiff's claims are barred by the defense of assumption of the risk.

The Court has considered all of the foregoing arguments and concludes as follows: (1) defendants have not met their burden under *Azzarello* of proving that their product is not unreasonably dangerous; (2) plaintiff's claim of defect due to a failure to warn presents genuine issues of material fact for determination by a jury; (3) plaintiff's claim of defect under the crashworthiness doctrine presents genuine issues of material fact for determination by a jury; and (4) the assumption of the risk defense presents genuine issues of material fact for determination by a jury.

### A. *Azzarrello Determination*

As noted above in Section IV of this Memorandum, *supra* at 617, under Pennsylvania law strict product liability claims arising under § 402A require a threshold risk/utility determination by the Court. In

the instant case, that initial determination involves a finding by the Court as to whether the Samurai in which plaintiff was traveling on March 10, 1996 was "unreasonably dangerous" as a matter of law. *See Azzarello*, 391 A.2d at 1024–26. Defendants SMC and ASMC bear the burden of establishing that the Samurai was not unreasonably dangerous, and if they succeed they are entitled to summary judgment. *See Shetterly*, 719 F.Supp. at 388.

■ In *Dambacher by Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408 (1984), a Pennsylvania Superior Court set forth seven factors a trial court should consider in determining whether a product is unreasonably dangerous. These are:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole;

(2) The safety aspects of the product—the likelihood it will cause injury and the probable seriousness of the injury;

(3) The availability of a substitute product which would meet the same need and not be unsafe;

(4) The manufacturer's ability to eliminate unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility;

(5) The user's ability to avoid danger by exercise of care in using the product;

(6) The user's anticipated awareness of the product's inherent dangers and their avoidability, because of general public knowledge of its obvious condition or the existence of suitable warnings or instructions; and

(7) The feasibility, on the part of the manufacturer, of spreading loss by setting the price or carrying liability insurance.

*See Dambacher by Dambacher*, 485 A.2d at 423 n. 5; *see also Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1046 (3d Cir.1997) (predicting that the Supreme Court of Pennsylvania would adopt this seven factor test). The Court has considered these factors and concludes that defendants have not met their burden of establishing that the Samurai is not unreasonably dangerous.

■ With respect to factor #1, the Court must assess the overall usefulness and desirability of the Samurai to the general public. Defendants argue that the Samurai is highly useful and that it satisfies a particular consumer need by providing an affordable option for consumers who desire a sport/utility-type vehicle with two-seat capacity and a rear cargo area. According to defendants, "a purchaser selecting this configuration for his use of the vehicle either doesn't want or need additional seating and should not be compelled to purchase more than what he needs or pay for more than is required."

However, plaintiff presented credible evidence that vehicles designed to carry cargo, such as sport pick-up trucks, meet the same consumer need and typically possess safety elements, such as tie-downs for securing loose cargo and a defined cargo area separated from the front compartment by a physical barrier.[2] *See* Report of Alan Cantor, Plaintiff's Exhibit G, at 5; attached to Doc. 41. The Samurai has none of these distinctive pick-up truck safety features. As a result, the Court concludes that the overall desirability and usefulness of the Samurai as a cargo vehicle is limited. Although factor #1 presents a close question, the Court finds that overall it weighs in favor of plaintiff's posi-

---

**2.** The record contains no evidence with respect to whether such a physical barrier common to pick-up trucks would prevent passengers from entering the rear cargo area of the Samurai from the front passenger area, or whether it would present an impediment which passengers could step over. In either case, the Court finds that the mere existence of such a physical barrier would serve as a warning to passengers that they should not ride in the rear cargo area.

tion that the Samurai is unreasonably dangerous.

Factor # 2 calls for an examination of the safety aspects of the Samurai, including the likelihood that it would cause injuries to the public. In connection with this analysis, the Court notes that under § 402A a product must be safe for its "intended use," and that term includes "any use which is reasonably foreseeable to the seller." *Parks v. Alliedsignal, Inc.*, 113 F.3d 1327, 1331 (3d Cir.1997). Under the "crashworthiness doctrine," collisions are a foreseeable use of motor vehicles and, as such, defendants may be held liable where vehicles prove unsafe to withstand collisions. *See Habecker III*, 36 F.3d at 282–83.

Plaintiff presented credible evidence that defendants foresaw that passengers would ride in the rear cargo area of the Samurai. For example, the record includes a memorandum, dated September 20, 1990, in which an executive of defendant SMC addressed the possibility of installing a physical divider between the front-seat passenger area and the rear cargo area of the Samurai "in order to make it conceivable to anyone that [the Samurai] is a two seater" and thereby discourage people from riding in the rear. *See* Plaintiff's Exhibit I; attached to Doc. 41. The idea was abandoned because defendant SMC had decided to "stop sales at the end of [the 1992] model year" and SMC wanted "to spend as little on mold costs as possible." *Id.* In addition, plaintiff presented industry studies, conducted by defendants, concerning the incidence of passenger ejections from the rear compartment of Samurais. *See* Plaintiff's Exhibit B; attached to Doc. 41. These studies disclosed a high rate of rear passenger ejections from the Samurai, resulting in serious, sometimes fatal, injuries.

The Court notes that the Samurai at issue contains a warning to passengers, which instructs: "Do not ride as a passenger in the rear of this vehicle or you could suffer severe injury or death in the event of an accident, abrupt maneuver, etc." However, plaintiff produced an expert witness, Dr. Robert J. Cunitz, a Human Factors Psychologist specializing in product safety, who opined that this warning label was inadequate to make passengers aware of the dangers of riding in the rear cargo area of a Samurai because the "placement of this warning near the bottom of the wheel well covering ... was unlikely to be seen by potential passengers." *See* Report of Robert J. Cunitz, Ph.D., Plaintiff's Exhibit M, at 6; attached to Doc. 41. In light of the foregoing evidence, the Court finds that factor # 2 weighs in favor of plaintiff's position that the Samurai is unreasonably dangerous.

In connection with factor # 3 the Court must consider the availability of substitute products in the marketplace which would meet the same consumer need and not be unsafe. Defendants contend that there are no such substitutes available. They claim that by design the Samurai is a two-seat vehicle with a rear cargo area, and that in any vehicle "any area without a seat is subject to a person putting a person there despite the obvious risks of doing so." Despite defendants's emphasis on the utility for consumers of the rear cargo area of the Samurai, the Court agrees with plaintiff's position that other vehicles, such as sport pick-up trucks, satisfy much of the same consumer demand. Unlike the Samurai, sport pick-up trucks meet this demand more safely because, *inter alia,* they provide tie-downs for securing loose cargo and their front and rear compartments are demarcated by a physical barrier which serves as a warning to passengers not to ride in the cargo area. *See* Plaintiff's Exhibit G, at 5. For that reason, the Court finds that factor # 3 weighs in favor of plaintiff's position that the Samurai is unreasonably dangerous.

With respect to factor # 4, the Court must consider the feasibility of eliminating the unsafe character of the Samurai without impairing its usefulness or making its price prohibitive for consumers who desire

that vehicle. Plaintiff presented credible evidence that defendant SMC considered installing a physical divider between the front-seat area and the rear cargo area of the Samurai; the record is not clear whether the divider under consideration would have completely blocked passage between the front seats and the rear cargo area, or whether it would simply have presented an obstacle for passengers to step over. What is clear is that the concept was abandoned because SMC planned to discontinue sales of the Samurai at the end of the 1992 model year, and it wanted "to spend as little on mold costs as possible." Plaintiff's Exhibit I.

Defendants do not argue that the installation of a physical divider was financially prohibitive, or that it would have created a mechanical problem or production impediment. On the record before the Court defendants have not established that the installation of a divider was not feasible. *See Habecker III*, 36 F.3d at 286 (noting that unfeasibility requires a showing that the improvement is incapable of being made on the product, that it is mechanically incompatible, or that it is nonexistent altogether). Even if such a barrier would not have completely blocked passage from the front seats to the rear cargo area, such a divider would, at a minimum, have served as a warning to passengers not to ride in the rear cargo area. A divider would have made the Samurai safer with little or no negative impact on the vehicle's overall utility. Accordingly, the Court finds that factor # 4 weighs in favor of plaintiff's position that the Samurai is unreasonably dangerous.

■ With respect to factors # 5 and # 6, the Court notes as an initial matter that the word "user" refers to the ordinary consumer who purchases or uses the product; it does not refer to the plaintiff in this particular case. *See Surace*, 111 F.3d at 1051. Also, "[u]nlike the law of negligence, product liability laws do not impose a duty upon the consumer; they instead encourage manufacturers to make safe products even for the careless and unreasonable consumer. A plaintiff cannot be precluded from recovery in a strict liability case because of his own negligence. The inquiry is whether the product is defective for ordinary use and misuse." *See Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 119 (3d Cir.1992) (quoting *Berkebile*, 337 A.2d at 901).

Factor # 5 requires the Court to assess the ordinary consumer's ability to avoid danger by the exercise of due care when using the Samurai. Defendants argue that the ordinary consumer had such ability due to the open and obvious nature of the danger plaintiff attributes to their product. The Court disagrees.

In order to determine whether the ordinary consumer would, by the exercise of due care, be able to avoid the dangers associated with the Samurai, the Court must consider how the vehicle was perceived by the public. In connection with this consideration, plaintiff presented credible evidence that the Samurai was widely depicted in advertisements for a number of years as a four passenger vehicle. *See* Plaintiff's Exhibit E; attached to Doc. 41. In addition, plaintiff presented an engineering and design expert who opined that "the appearance of the Samurai is substantially similar to other four passenger SUV's such as the Daihatsu Rocky, Geo Tracker, Jeep Wrangler and Suzuki's Jimmy. In fact, a consumer's perception is that the Samurai is a jeep-type vehicle consisting of both front, and rear seating." *See* Plaintiff's Exhibit G, at 5. This evidence, coupled with the absence of a divider between the front seats and the rear cargo area, supports plaintiff's argument that at least some ordinary consumers may not have fully appreciated the risks associated with riding in the rear cargo area of the Samurai. Accordingly, the Court finds that factor # 5 weighs in favor of plaintiff's position that the Samurai is unreasonably dangerous.

In connection with factor # 6, the Court must assess the ordinary consumer's antic-

ipated awareness of the dangers allegedly inherent in the Samurai, and the avoidability of such dangers. As noted, defendants' own marketing materials depicted the Samurai as a four passenger vehicle for a number of years. This advertising undermines defendants' position that the ordinary consumer should have been aware that there were serious risks associated with riding unrestrained in the rear cargo area of a Samurai.

Additionally, the Court must consider the fact that as of 1992 the Samurai contained a warning label which advised that there are risks associated with riding in the rear cargo area of a Samurai. On this issue plaintiff presented a Human Factors Psychologist, who opined that the "warning label was inadequate to make passengers aware of the dangers of riding in the rear cargo area of the Samurai." Plaintiff's Exhibit M, at 6. For these reasons—the advertisements and the expert opinion concerning the adequacy of the warning label—the Court finds that factor #6 weighs in favor of plaintiff's position that the Samurai is unreasonably dangerous.

Finally, in connection with factor #7, the Court must consider the feasibility of defendants spreading the losses associated with the allegedly defective Samurai by, *inter alia,* adjusting the market price of the vehicle or by carrying liability insurance. On this issue defendants claim that "it was not economical to do the re-engineering necessary [for equipping the Samurai with a rear cargo area restraint system]." However, that argument, without more, is insufficient to establish unfeasibility. *See Habecker III,* 36 F.3d at 286. Defendants have failed to satisfy their burden with respect to this factor and, as a result, the Court concludes that it weighs in favor of plaintiff's position that the Samurai is unreasonably dangerous.

### B. *Claim of Defective Design for Failure to Warn*

Having concluded that plaintiff's claim survives the threshold inquiry for a strict liability action under § 402A—the *Azzarello* determination—the Court must next address plaintiff's specific theories of design defect. Plaintiff first argues that defendants are strictly liable because they failed to adequately warn him of the dangers associated with riding unrestrained in the rear cargo area of the Samurai, as he did on the morning of March 10, 1996.

In Section IV of this Memorandum, *supra* at 8, the Court set out the three elements of a typical action under § 402A which it must now apply. In their motion papers, defendants do not address prongs #2 and #3 of that test, so the Court need not consider them at this time. Rather, defendants focus their challenge on prong #1, arguing that the Samurai could not be defective as a matter of law because there is no duty to warn of an open and obvious danger. The Court disagrees and concludes that defendants had a duty to warn ordinary consumers of the Samurai as to the dangers associated with riding unrestrained in the rear cargo area.

A "defective" condition, as used in prong #1, includes the lack of adequate warnings for a product's safe use. *See Fleck,* 981 F.2d at 119; *Berkebile,* 337 A.2d at 902. If a product is defective because it lacks an adequate warning, and the other prongs of a claim under § 402A are satisfied, the supplier of the product may be held strictly liable. *See Fleck,* 981 F.2d at 119. If, however, the danger is open and obvious, there is no duty to warn. *See Sherk v. Daisy Heddon,* 285 Pa.Super. 320, 327–28, 427 A.2d 657, 660 (1981), *reversed on other grounds,* 498 Pa. 594, 450 A.2d 615 (1982).

Whether a danger is open and obvious is an objective inquiry, not dependent upon the actual knowledge of the product's user or his actual awareness of the danger. *See Sherk,* 427 A.2d at 661. The Court must inquire whether knowledge of the danger would be possessed by "the ordinary consumer who purchases [or uses the product], with the ordinary

knowledge common to the community as to its characteristics." *Id.* (quoting Restatement (Second) of Torts § 402A, comment (i)). For instance, "[i]f the product is one customarily used by children, the danger must be one which children would be likely to recognize and appreciate in order to prevent them from recovering for a product related injury on the grounds that the danger was open and obvious." *Id.*

*Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d at 107, is instructive precedent on the question of what constitutes an open and obvious danger. In *Fleck,* the plaintiff dove into a three-and-half foot deep above-ground swimming pool, broke his neck, and was rendered a quadriplegic. The plaintiff sued the manufacturer and seller of the pool in strict liability for failing to include depth markers or "no diving" warnings with their product. The defendants responded by arguing that they had no duty to warn because the danger associated with diving into a body of water of uncertain depth is open and obvious. The Third Circuit rejected this position. *Id.* at 119. The court explained that when determining whether a danger is open and obvious the key "inquiry is whether the product is defective for ordinary use and foreseeable misuse." *Id.* Accordingly, the Court held that because it was "clearly foreseeable [to the defendants] that consumers, children and adults alike [ ] would dive into a pool of unknown depth," defendants could not discharge their duty to warn by claiming that the danger was open and obvious. *Id.* at 119.

As in *Fleck,* defendants SMC and ASMC raise an open and obvious danger defense to plaintiff's failure to warn claim. They argue that there was no duty to warn because "anyone getting into the cargo area of the two-seater [Samurai] could not fail to recognize that it is neither designed or equipped to transport passengers in the rear seat." However, as noted earlier in this Memorandum, plaintiff presented evidence that defendants were actually aware that ordinary consumers might choose to ride unrestrained in the rear cargo area of the Samurai. On that issue, plaintiff provided an internal company memorandum in which an executive of defendant SMC stated that a physical between the front seats and the rear cargo area was needed "in order to make it conceivable to anyone that [the Samurai] is a two-seater." Plaintiff's Exhibit I. Also, plaintiff presented evidence that the Samurai was widely marketed to the American public as a four passenger SUV. *See* Plaintiff's Exhibit E. In addition, plaintiff presented evidence that defendant SMC conducted industry studies concerning the incidence of passenger ejections from the rear cargo area of the Samurai. *See* Plaintiff's Exhibit B.

In light of all the foregoing evidence that defendants knew that ordinary consumers, such as plaintiff, might choose to travel unrestrained in the rear cargo area of the Samurai, defendants can not discharge their duty to warn by asserting that the dangers associated with their product were open and obvious. *See Fleck,* 981 F.2d at 119; *see also Surace,* 111 F.3d at 1052 ("It is not necessarily sufficient to render a product duly safe that its dangers are obvious, especially if the dangerous condition could have been eliminated.").

Defendants cite several cases in support of their position that there is no duty to warn in the instant case, all of which are inapposite. For example, defendants rely on *Weiner v. American Honda Motor Co., Inc.,* 718 A.2d 305 (1998), a case where a Pennsylvania Superior Court affirmed summary judgment in favor of the manufacturer of a two-door hatchback automobile. In *Weiner* the plaintiff asserted a failure to warn claim because he was injured when the car he was operating hit a guard rail and an unrestrained 180 pound canister of gas in the cargo area slid forward into the back of his seat. The Superior Court had no trouble concluding that carrying a 180 pound cannister of gas was not an intended use of the defendant's two-door hatchback vehicle, and that there was

no duty to warn against such unforeseeable misuses of a product. *See Weiner,* 718 A.2d at 308. However, unlike *Weiner,* the product use alleged in the instant case—riding unrestrained in the rear cargo of a Samurai—was foreseen by defendants. As a result, defendants' reliance on *Weiner* is misplaced.

Defendants also rely on *Maneely v. General Motors Corp.,* 108 F.3d 1176 (9th Cir. 1997). In *Maneely,* plaintiffs sued General Motors for injuries sustained while riding unrestrained in the cargo bed of a pick-up truck. The Ninth Circuit affirmed the granting of General Motor's motion for summary judgment on the grounds that the dangers of riding in the cargo bed of the pick-up truck were open and obvious and that no reasonable jury could find that the pickup truck's design, including it's absence of safety belts in the cargo bed, was defective. *Id.* at 1181.

Of all the cases cited by defendants, *Maneely* is the most similar factually to the instant case. However, there is at least one important distinction between the two cases: the pick-up truck in *Maneely* had a defined cargo area separated from the front compartment by a physical barrier. As discussed earlier in this Memorandum, *supra* at 619–20, pick-up trucks often include tie-downs for securing loose cargo and a cargo bed compartmentalized from the front passenger area by a divider. *See* Plaintiff's Exhibit G, at 5. Such design features unquestionably serve to warn prospective passengers that they should not ride in the rear of a pick-up truck. By contrast, Samurais do not contain either tie-downs or a divider between the two front seats and the rear cargo area. As a result, the Court does not find *Maneely* persuasive.

▬ Finally, the Court notes that the Samurai in which plaintiff was riding on

March 10, 1996 contained a warning label, approximately 2.4 × 2.8 inches in size and located about 1–1/4 inches above the cargo bed on the left rear wheel well. *See* Plaintiff's Exhibit L; attached to Doc. 41. Defendants argue that, to the extent the Court finds that they had a duty to warn in this case, this warning label satisfied that duty as a matter of law. The Court disagrees. As noted, plaintiff presented an expert specializing in product safety who opined that the "warning label was inadequate to make passengers aware of the dangers of riding in the rear cargo area of the Samurai" because its placement "near the bottom of the wheel well ... was unlikely to be seen by potential passengers." Plaintiff's Exhibit M, at 6. In addition, plaintiff testified that although he could not recall whether or not he actually saw the warning, if he had noticed it he would have "made other plans—decided not to sit there and made other plans, taken another vehicle."

In light of the foregoing evidence, the Court concludes that there is a genuine issue of material fact for determination by the jury with respect to the adequacy of the warning label at issue in this case. *See Berkebile,* 462 Pa. at 101–02, 337 A.2d at 902 ("[t]he sole question here is whether the seller accompanied his product with sufficient instructions and warnings so as to make his product safe. This is for the jury to determine.").

### C. *Claim of Defective Design Under the Crashworthiness Doctrine*

Plaintiff's second theory of defect involves the crashworthiness doctrine. According to plaintiff, defendants are strictly liable because they failed to adequately design the Samurai to protect passengers riding in the rear cargo area during a collision.[3]

---

**3.** Plaintiff's submissions can be interpreted as advancing the theory that the Samurai is defective under the crashworthiness doctrine because it lacked rear seats with seat belts by virtue its design as a two-seater with a rear

cargo area. On this issue plaintiff's engineering and design expert opined that "[defendants] created a hazard by not properly redesigning the Samurai to include a rear seat with a three point belt system, or in the alter-

In Section IV of this Memorandum, *supra* at 618, the Court set out the four elements of a § 402A claim brought under the crashworthiness doctrine, which it must now apply. In their motion papers, defendants do not address prongs # 2, # 3 or # 4 of this test, so the Court need not consider them at this time. Rather, defendants focus their challenge on prong # 1, arguing that the Samurai could not be defective as a matter of law because it was safe for its "intended use." The Court disagrees and concludes that plaintiff has raised a genuine issue of material fact as to this question.

■ A product is "defective," as used in prong # 1, if it "left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Habecker III*, 36 F.3d at 282 (quoting *Azzarello*, 391 A.2d at 1027). In connection with this test, defendants contend that the Samurai is intended for use as a two-passenger vehicle with a rear cargo area, and they note that there is "no contention in this case that the vehicle would be unsafe if occupied by two front seat passengers wearing their seat belts, as intended." However, in a strict product liability case the Court's attention is focused on the product itself. *See Habecker v. Clark Equip. Co.*, 942 F.2d 210, 215 (3d Cir.1991) (*"Habecker II"*). The Court must determine how the Samurai is perceived by the public, not defendants' purported intended use.

Earlier in this Memorandum, in connection with factor # 5 of its *Azzarello* determination, *supra* at 621–22, the Court addressed the public's perception of the Samurai. The Court will not reiterate that analysis here, except to note that plaintiff presented credible evidence that the Samurai was advertised for a number of years as a four passenger vehicle and

that it was very similar in appearance to other four passenger SUVs.

Defendants rely on *Dreisonstok v. Volkswagenwerk*, 489 F.2d 1066 (4th Cir. 1974), for the proposition that vehicles with multiple intended uses can not be deemed defective simply because they possess an open area for cargo in which passengers might decide to ride. In *Dreisonstok* the plaintiff was injured while riding as a passenger in the front seat of a Volkswagen microbus when the vehicle, traveling at a speed of 40 m.p.h, collided with a telephone pole. The district court ruled in favor of the plaintiff, concluding that the vehicle's design was defective for failing to provide "sufficient energy-absorbing materials or devices or 'crush space' . . . so that at 40 miles an hour the integrity of the passenger compartment would not be violated." *Id.* at 1068–69.

In *Dreisonstok* plaintiff's case was premised on a comparison of the structural integrity of the passenger compartment in front-end collisions of the VW microbus, with that of the standard American passenger car. The Fourth Circuit found such a comparison invalid because the design of the microbus was "of special utility as a van for the transportation of light cargo, as a family camper, as a station wagon and for use by passenger groups too large for the average passenger car." *Id.* at 1074. The court added that "there was no evidence in the record that there was any practical way of improving the 'crashability' of the vehicle that would have been consistent with the peculiar purposes of its design." *Id.*

It is on this latter point that the instant case is readily distinguishable from *Dreisonstok*. Plaintiff presented credible evidence regarding the feasibility at least one improvement—the installation of a divider between the front seats and the rear cargo area—which defendant SMC considered but ultimately decided against doing be-

native: to take the vehicle off the market until appropriate safety features could be implemented." Plaintiff's Exhibit G, at 2. A ruling

on that aspect of the case is not necessary to the Court's decision.

cause it intended to "stop sales [of the Samurai] at the end of [the 1992] model year." *See* Plaintiff's Exhibit I. Accordingly, defendants' reliance on *Dreisonstok* is misplaced.

In light of the foregoing, the Court concludes that whether or not the Samurai's "intended use" includes service as a four passenger vehicle, and whether or not that vehicle is equipped for such intended use to be performed safely, are genuine issues of material fact to be determined by the jury. *See Harley v. Makita USA, Inc.,* No. 94–4981, 1997 WL 197936 at *3 (E.D.Pa. Apr.22, 1997) (noting that the term "intended use" "is not necessarily a synonym for properly.... If the use was abnormal but nonetheless reasonably foreseeable, the product will be found defective [and the] jury will make that determination based on the evidence.").

### D. *Assumption of the Risk*

Finally, the Court must address defendants' argument that plaintiff's assumption of the risk—by voluntarily riding in the rear cargo area of the 1992 Samurai—precludes their liability as a matter of law. In Pennsylvania assumption of the risk is a complete defense to strict products liability actions. *See, e.g., Surace,* 111 F.3d at 1054 (citing *McCown v. International Harvester Co.,* 463 Pa. 13, 15, 342 A.2d 381, 382 (1975)). In order to establish an assumption of the risk defense, a defendant must show that the plaintiff: (1) had actual knowledge of the specific product defect; and (2) voluntarily and unreasonably proceeded to encounter that danger. *See, e.g., Surace* 111 F.3d at 1054. "[W]hether the plaintiff knows of the existence of the risk, or whether he understands and appreciates its magnitude ... is a question of fact, usually to be determined by the jury under proper instructions from the court. The court may itself determine the issue only where reasonable men could not differ as to the conclusion." *Surace,* 111 F.3d at 1054 (quoting *Mucowski v. Clark,* 404 Pa.Super.

197, 202, 590 A.2d 348, 350 (1991)). A plaintiff's knowledge of the risk can be inferred from the circumstances. However, "mere awareness of a hazard does not establish that the user was fully aware of the risk of seriously bodily injury." *Pavlik v. Lane Ltd./Tobacco Exporters Int'l,* 135 F.3d 876, 889 (3d Cir.1998).

Defendants have not established prong # 1 of the test for an assumption of the risk defense-plaintiff's actual knowledge of the specific product defect. Defendant's point to plaintiff's testimony in which he stated that prior to March 10, 1996 he was in the habit of buckling his seat belt for general safety when riding in motor vehicles. Also, defendants argue that plaintiff admitted noticing that the rear cargo area lacked rear seats and contained no passenger restraint system, yet he voluntarily chose to ride in the rear cargo area of the Samurai.

However, plaintiff also testified that, while he did not specifically recall whether or not he had seen the Samurai's warning label, had he noticed such a warning, or if there had been a physical divider between the front seats and the rear cargo area, he would have "made other plans-decided not to sit there and made other plans, taken another vehicle." *See* Plaintiff's Deposition Testimony, Defendants' Exhibit D, at 123; attached to Doc. 40. Moreover, plaintiff presented an expert specializing in product safety who opined that the "warning label was inadequate to make passengers aware of the dangers of riding in the rear cargo area of the Samurai" because the "placement of this warning near the bottom of the wheel well covering ... was unlikely to be seen by potential passengers." Plaintiff's Exhibit M, at 6.

In light of the foregoing evidence, the Court concludes that there is a genuine issue of material fact with respect to plaintiff's actual knowledge of the dangers associated with riding in the rear cargo area of a Samurai. As a result, defendants are

not entitled to summary judgment on the assumption of the risk defense.

## VI. CONCLUSION

For all the foregoing reasons, the Joint Motion of Defendants Suzuki Motor Corporation and American Suzuki Motor Corporation is denied.