Thomas J. BOWERSFIELD,
Jr., Plaintiff,

v.

SUZUKI MOTOR CORPORATION
and American Suzuki Motor
Corporation, Defendants.

v.

Christian French, Third
Party Defendant.

No. 98–1040.

United States District Court,
E.D. Pennsylvania.

July 23, 2001.

---

Andrew Stern, Philadelphia, PA, for plaintiff.

Eric Weiss, Philadelphia, PA, for defendants.

### *MEMORANDUM*

DUBOIS, District Judge.

## I. BACKGROUND

This case arises out of an automobile accident which occurred in the early morning hours of March 10, 1996 at the intersection of 7th and Spruce Streets in Philadelphia, Pennsylvania. At that time, plaintiff, Thomas J. Bowersfield, Jr., and two companions were traveling west on Spruce Street in a 1992 Suzuki Samurai (the "Samurai"). Another vehicle traveling north on 7th Street collided with the Samurai and sped away.

The Samurai was designed and manufactured by defendant Suzuki Motor Corporation ("SMC"), a Japanese auto manufacturer. In the United States, it was distributed by defendant American Suzuki Motor Corporation ("ASMC"), a California corporation.

By Order and Memorandum dated August 28, 2000, the Court denied the defendants' joint motion for summary judgment. *See Bowersfield v. Suzuki Motor Corp.,* 111 F.Supp.2d 612 (E.D.Pa.2000). The facts and legal theories advanced by the parties are set forth in detail in that Memorandum, and will not be repeated in this Memorandum.

On September 21, 2000, defendants SMC and ASMC filed a Motion in Limine to Preclude the Testimony of Plaintiff's Expert, Alan Cantor. By Order dated April 5, 2001, the Court ordered a hearing under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) to address the issues raised in that motion. *See Oddi v. Ford Motor Co.,* 234 F.3d 136, 155 (3d Cir.2000) (explaining that a *Daubert* hearing is necessary where a court can "not

determine what methodology the expert used, and the reliability of the expert's conclusion could therefore not be established"); *see generally Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412, 417 (3d Cir. 1999) (stressing the importance of *in limine* hearings under Rule 104(a) in making the reliability determination required under Rule 702) (citing *United States v. Downing*, 753 F.2d 1224, 1241 (3d Cir. 1985)). The hearing was held on July 11 and 12, 2001.

At the *Daubert* hearing, defendants frequently objected that the testimony of Mr. Cantor went beyond the scope of his expert report. The Court will address both those objections and the *Daubert* issues in this Memorandum.

## II. DISCUSSION

### A. Expert Testimony Under *Daubert*

Federal Rule of Evidence 702, as amended December 1, 2000, provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, when "[f]aced with a proffer of expert scientific testimony ... the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592,

113 S.Ct. at 2796 (footnotes omitted). It is well settled that the gatekeeping role established in *Daubert* under Rule 702 is not limited to scientific testimony—the *Daubert* approach applies to all cases where the "testimony reflects scientific, technical, or other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999). The *Daubert* factors may apply to the testimony of engineers and other experts who are not scientists. *Id.* This approach helps to ensure the reliability of expert testimony, which "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2798 (quoting Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991)).

Under *Daubert*, the Court must engage in a two-step inquiry. "First of all, the proffered 'expert' must be qualified to express an expert opinion.... Secondly, the proffered expert opinion must be reliable." *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir.1999). With respect to this inquiry, a number of criteria to guide the courts in making reliability determinations have been identified, including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to he reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Elcock v. Kmart Corp.*, 233 F.3d 734, 745–46 (3d Cir.2000) (quoting *In re Paoli R.R.*

*Yard PCB Litig.*, 35 F.3d 717, 742 n. 8 (3d Cir.1994) (*"Paoli"*)). This list is not exhaustive—the inquiry under *Daubert* should remain a flexible one. *See, e.g., Elcock,* 233 F.3d at 746 (writing that *"Kumho Tire* makes clear that this list is non-exclusive and that each factor need not be applied in every case"); *Schieber v. City of Philadelphia,* 2000 WL 1843246, at *2 (E.D.Pa. Dec.13, 2000) ("These factors are non-exclusive and no one of the factors weighs more heavily than another; the approach to determining the admissibility of expert testimony is a flexible one.") (citing *Daubert,* 509 U.S. at 594, 113 S.Ct. 2786). As a general rule, the party offering the expert testimony has the burden of establishing its admissibility by a preponderance of the evidence. *See Padillas v. Stork–Gamco, Inc.,* 186 F.3d 412, 418 (3d Cir.1999).

## B. Testimony of Mr. Cantor

Plaintiff plans to use Alan Cantor's testimony to establish that the 1992 Suzuki Samurai involved in this case was defectively designed, and that the defects caused plaintiff's injuries. Specifically, plaintiff argues that the vehicle should have been marketed with a rear seat with three-point seatbelts, or, in the alternative, with a barrier separating the rear cargo area from the front two seats and an adequate warning of the danger of riding in that area.

In the Motion in Limine, defendants challenge Mr. Cantor's expert report as being conclusory and lacking the requisite methodology. At the hearing, defendants interposed numerous objections to Mr. Cantor's testimony on the ground that it was beyond the scope of his report.

Mr. Cantor, who holds a B.S. in aerospace engineering from Pennsylvania State University, has spent his career in the fields of occupant crash protection, emergency escape, crash safety, crash survival, and life-support engineering for both ground and air vehicles. Ex. P–52–A. Mr. Cantor was employed as a civilian for the United States Navy from 1973 through 1987 where he designed, developed, and tested crashworthy seats, restraints and similar systems. Hr'g Tr., July 11, 2001 ("Tr.1") at 44. From 1985 to 1987, while working for the Navy, he was "the technical director of all crashworthy items, including helicopters, ejection seats and other crash components." *Id.* at 43. After the explosion of the Space Shuttle Challenger, he headed a team that designed an emergency egress system, still in use. *Id.* at 45. In 1987, he left the Navy and started his company, ARCCA, Inc., where he does similar work on vehicle safety and restraint systems. His company has performed approximately 3,000 crash investigations. *Id.* at 52.

Mr. Cantor designed a seat for the United States Army, the common crashworthy occupant protection system ("CCOPS"), for which he is a patent holder. That seat was designed to be placed into any light truck or multipurpose vehicle where it would provide occupant protection "irregardless of other things within the vehicle." Tr. 1 at 42, 50–52; Ex. P–52–R. Among the articles, manuals and treatises Mr. Cantor has written, he was one of the principal authors of a treatise, Mil. S. 18471G, used by the Navy to create air crew escape systems—common ejection seats that can be used "for any application just by making quick modifications." Tr. 1 at 35–36; Ex. P–52–I. Mil S. 18471G "dealt with how to design, what are the stages of the design, what are the requirements for human tolerance, how do you evaluate the human data, how you structurally make the seat work, [and] how to apply the forces." Tr. 1 at 36. He also wrote a treatise applying that technology to light

trucks and other ground vehicles. Tr. 1 at 38–39.

In his work, Mr. Cantor has extensively studied and written on the kinematics of vehicle occupants—the way the occupants move when subjected to certain physical forces. Tr. 1 at 40–42; Exs. P–52–Q, R. These studies included other accidents which involved Suzuki Samurais. Tr. 1 at 56–60. Mr. Cantor is familiar with the requisite vehicle safety standards, including those relating to seatbelts, barriers, and placement, but not content, of warning labels.

In Mr. Cantor's expert report, dated July 26, 1999, he listed ten conclusions. He concluded, *inter alia*, that the 1992 Suzuki Samurai was hazardous for passengers in the rear of the vehicle; had Suzuki provided rear seats with three-point seatbelts, "Mr. Bowersfield would have been afforded the opportunity to restrain himself and thus given protection from the grievous injuries he sustained;" the warning in the rear area of the Samurai is inadequate; and the injuries sustained by Mr. Bowersfield "could have been avoided had Suzuki provided the Samurai with the necessary elements of safety for its foreseeable use when it left Suzuki's control." Mr. Cantor also opined on the need for placement of a barrier behind the two front seats of the Samurai as an alternative to installing seats with three-point seatbelts in the rear area, and placement of an adequate warning label.

In his testimony before the Court, Mr. Cantor elaborated on the conclusions and the substance of his report. Most relevantly, he stated that there is a hierarchy of engineering principles relating to design—(1) design out potential hazards; (2) if that is not possible, guard against those hazards as best as possible; and (3) warn potential users of any hazards that could not be designed out. Tr. 1 at 49, 80–81, 105–06. Mr. Cantor identified the hazard in the 1992 Suzuki Samurai as use of the rear area of the vehicle for occupant seating. He said the rear area was defectively designed because Suzuki provided rear seats for all previous years of manufacture, and as shown by Suzuki documents and what he characterized as an inadequate warning in the rear of the Samurai, it was readily foreseeable that someone would ride in that area.

Mr. Cantor explained that the best remedy for the hazards in the 1992 Samurai was the installation of seats with three-point seatbelts in the rear area of the vehicle. At the *Daubert* hearing, he produced drawings and photographs of various ways to do so. For instance, he explained how the roll cage could be extended and modified to provide an anchor for the seatbelts, and provided photographs, technical drawings and calculations of the proposed modifications. Tr. 1 at 100–01, 110–11; Hr'g Tr., July 12, 2001 ("Tr. 2") at 54–60; Exs. P–52–V, W, X, Y, Z, AA, BB; Exs. P–63–D, E, F, G. He also testified that other vehicles manufactured at the same time, including other Suzukis, provided rear seats with three-point seatbelts secured to roll cages or the vehicle frame.[1] Tr. 1 at 112–13; Exs. P–52–J, T, U, KK. He showed that the CCOPS seat could fit into the rear of the

---

1. Mr. Cantor produced the owner's manual for 1991 Suzuki Samurais sold in South America, and explained that one model, an SJ410V, had rear seats with three-point seatbelts. Tr. 1 at 92–94, 112; Ex. P–52–J. He also testified that the 1992 Suzuki Sidekick—the "sister vehicle to the Samurai"—had rear seats with three-point seatbelts. Tr. 1 at 94; Tr. 2 at 120–23; Ex. P–52–KK. With respect to other manufacturers, he produced sales brochures which showed that the 1992 Izuzu Amigo and the 1992 Jeep Wrangler had rear seats with three-point seatbelts. Tr. 1 at 94, 113–14. Exs. P–52–T, U.

vehicle with some added floor reinforcement, but without modifying the floor design. Tr. 2 at 61–63. Additionally, the methodology of placing seats and seatbelts is well defined in treatises, peer-reviewed literature, and Federal Government standards. Tr. 1 at 89–90.

It was Mr. Cantor's testimony that if Suzuki could not design around the hazard by installing a rear seat with three-point seatbelts, the next best thing would be to guard against the hazard by installing a barrier and placing an adequate warning in the rear area. Tr. 1 at 119. Such a barrier would protect the front occupants from any danger caused by cargo in the rear, and make it clear to people who might think about riding in the rear cargo area that the 1992 Samurai was not designed to have people ride there. Tr. 1 at 135–36. In amplifying this testimony, he said that he designed a barrier for use in the vehicle which was in accordance with peer-reviewed literature, and provided photographs, technical drawings and calculations of the proposed barrier. Tr. 1 at 123. Exs. P–52–H, CC, DD, EE, FF, GG, HH, II; Exs. P–63–J, K.

Additionally, Mr. Cantor testified that, if the vehicle did not have rear seats with three-point seatbelts, Suzuki should have placed a better warning label in the rear of the Samurai. He explained that there is peer-reviewed literature on the proper size and placement of a warning label. Tr. 1 at 144–45; Exs. P–52–L, M. Mr. Cantor also testified that he does not have expertise on the wording of such labels. Tr. 1 at 72.

■ While the conclusions presented by Mr. Cantor at the *Daubert* hearing were consistent with his expert report, much of the methodology and bases for the conclusions to which he testified were not contained in his expert report. For example, his report did not contain any of the photographs, technical drawings or calculations

of the proposed vehicle modifications for seats with three-point seatbelts, the barrier or the proper placement of a warning label. Consequently, the first question presented by defendants' motion is the extent to which the Court, in addressing the *Daubert* issues, should consider Mr. Cantor's hearing testimony that is beyond the scope of his report.

■ "Testimony of an expert on matters within the expert's expertise but outside of the expert's report is not only permissible at trial, but the exclusion of such testimony may be reversible error.... An expert may testify beyond the scope of his report absent surprise or bad faith." *Fritz v. Consolidated Rail Corp.*, 1992 WL 96285, *3 (E.D.Pa. Apr.23, 1992) (Hutton, J.) (Citing *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193 (3d Cir.1978)). Courts within this district have also noted that there is no local custom, practice or rule which would limit an expert's testimony to the strict confines of his report. *See id.* at *3 (citing *Kelly v. GAF Corp.*, 115 F.R.D. 257 (E.D.Pa.1987) (Ditter, J.))

■ This Court will use the test the Third Circuit has articulated to determine when a district court should exclude testimony for failure to comply with pre-trial notice requirements:

1. the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified;

2. the ability of that party to cure the prejudice;

3. the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court;

4. bad faith or willfulness in failing to comply with the court's order.

*DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1201–02 (3d Cir.1978) (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 904 (3d Cir.1977)). Further, the Court notes that "exclusion of evidence is a drastic sanction which must pass the strict *Meyers* test to be upheld." *Id.* (citing *Coleco Indus., Inc. v. Berman,* 567 F.2d 569, 576 n. 14 (3d Cir.1977)).

The Court concludes that, applying the aforesaid factors, Mr. Cantor's testimony should not be limited to what is set forth in his report. This determination is based on the fact that the conclusions reached by Mr. Cantor at the *Daubert* hearing were consistent with the report, although the testimony substantially expanded on the details of his methodology and the bases for his opinions, and any prejudice to defendants can be cured.

What defendants should have done upon receipt of Mr. Cantor's conclusory report was to take his deposition, but they did not do so. Nevertheless, any prejudice to the defendants caused by permitting Mr. Cantor to testify at trial in accordance with his testimony at the *Daubert* hearing may be cured by the granting of leave to the defendants to respond to Mr. Cantor's *Daubert* testimony with supplemental expert reports. Further, as there have been no depositions of expert witnesses, both parties will be allowed to depose opposing experts.[2] In the depositions, the experts will not be permitted to add theories not contained within their reports. By way of example, if there were no mention of a barrier in a report, the expert would not be allowed to testify that a barrier was required. However, if the opinion that a barrier was necessary was included in a report, but the expert did not state how he arrived at that conclusion, the expert

would be permitted to state the bases for his conclusion.

Further, at the *Daubert* hearing, the Court ruled that Mr. Cantor would not be permitted to testify to the data gathered from other investigations conducted after the date his report was prepared, July 26, 1999. Specifically, the Court excluded tests run in November 2000 on a modified seat used as an alternate design in *Moore v. Suzuki.* Because any prejudice to the defendants can be alleviated by the procedure outlined above, this order will be vacated.

 The Court will now address Mr. Cantor's report and hearing testimony and determine whether, under *Daubert,* he is qualified to express his stated opinions. Mr. Cantor testified at length to the principles and methodology he applied in reaching the conclusions outlined in his report. He relied upon well accepted peer-reviewed literature and treatises, some of which he authored. He is clearly qualified to offer opinions as to the alleged design defects of the 1992 Suzuki Samurai, its crashworthiness, the sufficiency of the warning label, and causation. He is also qualified to testify about the placement of seats with three-point seatbelts or a barrier in the rear of the 1992 Suzuki Samurai. Likewise, he may testify to the proper placement and size of a warning label. Since he admitted he was not familiar with the contents of warning labels, he may not testify on that subject.

## III. CONCLUSION

For the foregoing reasons, the Court will deny defendants' Motion in Limine. The Court finds Mr. Cantor to be qualified to offer an expert opinion on the subjects stated above. To avoid any prejudice, the

---

**2.** Defendants will not be allowed to depose Mr. Cantor because they were granted leave

to ask deposition-type questions at the *Daubert* hearing.

parties will be allowed the very limited reopening of expert discovery as set forth above. An appropriate order follows.

### *ORDER*

**AND NOW,** this 23rd day of July, 2001, upon consideration of the Motion in Limine of Defendants, Suzuki Motor Corporation and American Suzuki Motor Corporation, to Preclude the Testimony of Plaintiff's Expert, Alan Cantor (Document No. 60, filed September 21, 2000) and Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Preclude the Testimony of Alan Cantor at the Time of Trial (Document No. 94, filed October 26, 2000), the Court having conducted a *Daubert* hearing on July 11 and 12, 2001 with respect to the issues raised in the motion, for the reasons stated in the attached Memorandum, **IT IS ORDERED** that the Motion in Limine of Defendants, Suzuki Motor Corporation and American Suzuki Motor Corporation, to Preclude the Testimony of Plaintiff's Expert, Alan Cantor (Document No. 60, filed September 21, 2000) is **GRANTED IN PART** and **DENIED IN PART.** Alan Cantor will be **PERMITTED** to testify regarding his opinions on:

1. Defects in the 1992 Suzuki Samurai;

2. Placement of the warning label in the 1992 Suzuki Samurai, but not the content of the warning label;

3. Crashworthiness of the 1992 Suzuki Samurai; and

4. Causation of the injuries suffered by Thomas J. Bowersfield, Jr.

In all other respects the Motion in Limine is **DENIED.**

**IT IS FURTHER ORDERED** that the Court's oral order of July 11, 2001 relating to use of data from tests run in November 2000 in *Moore v. Suzuki* is **VACATED.**

**IT IS FURTHER ORDERED** as follows:

1. Defendants are permitted to supplement their expert reports to respond to the testimony and opinions offered by Alan Cantor in his report and in the *Daubert* hearing;

2. The parties are given leave to depose experts other than Alan Cantor who have not already been deposed;

3. All additional expert discovery must be completed by September 17, 2001; and

4. A final pretrial conference is scheduled for Monday, October 1, 2001 at 3:00 p.m.